**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARCUS KORNEGAY, as Administrator of the Estate of JAMES JOHNSON, *et al.*,<br><br>　　*Plaintiffs*,<br><br>　v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>　　*Defendants*. | Case No. 24-cv-1010-ABA |
| LAYARNIA TURNER, as Administrator of the Estate of DOMINIQUE WILLIAMS, *et al.*,<br><br>　　*Plaintiffs*,<br><br>　v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>　　*Defendants*. | Case No. 24-cv-1011-ABA |
| MICHAEL THOMAS,<br><br>　　*Plaintiff*,<br><br>　v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>　　*Defendants*. | Case No. 24-cv-1012-ABA |

**MEMORANDUM OPINION**

On April 7, 2021, Defendant David Dixon shot at a vehicle with three occupants: Dominique Williams, James Johnson, and Michael Thomas. Dixon's shots killed Williams and Johnson. Thomas survived. At the time, Dixon was working for the Pentagon Police Force Agency ("PFPA"), a federal law enforcement agency within the U.S. Department of Defense, and was on his way to work. Plaintiffs have sued the United States and Dixon. The government has moved to dismiss or for summary judgment. For the reasons that follow, the motions will be granted in part and denied in part.

1

**Table of Contents**

I.   Background ...................................................................................................... 3

II.  Standards of Review ........................................................................................ 9

    A.   Subject-Matter Jurisdiction under Rule 12(b)(1) ................................. 9

    B.   Failure to State a Claim under Rule 12(b)(6) ...................................... 9

III. Discussion ...................................................................................................... 10

    A.   Subject-Matter Jurisdiction ................................................................ 10

        i.   Scope of employment .................................................................. 11

        ii.  Discretionary function exception ................................................ 17

        iii. Presentment ................................................................................ 24

            a.  Legal standards ..................................................................... 24

            b.  Williams's and Johnson's children (through their mothers as
                parents and next friends) .................................................... 27

            c.  Layarnia Turner, as administrator of Williams's estate ...................... 28

            d.  Turner Plaintiffs in their individual capacities.................................... 28

    B.   Whether Plaintiffs sufficiently state a claim for negligent supervision/
        retention and negligent entrustment.................................................... 29

        i.   Negligent supervision/retention................................................. 29

        ii.  Negligent entrustment ................................................................ 31

    C.   The government's alternative motions for summary judgment ....................... 32

IV.  Conclusion ..................................................................................................... 33

## I.    BACKGROUND[1]

The PFPA is responsible for security on what the complaint describes as the "Pentagon Reservation." *Kornegay* ECF No. 1 ¶¶ 3, 19.[2] But as explained below, PFPA officers are also considered "on-call" when they are "traveling directly from home to work immediately preceding a shift with a PFPA issued weapon for the purpose of arriving on duty armed" or are "traveling directly from work to home immediately at the conclusion of a tour of duty with a PFPA issued weapon for the purpose of properly securing the weapon at home." *Id.* ¶ 21; *Kornegay* ECF No. 17-4 at 6 (PFPA Regulation No. 9101 at § IV.L).[3] During the time period relevant to this case, Dixon was employed by PFPA as a law enforcement officer and kept his PFPA-issued handgun at his home at the Takoma Overlook Condominiums, in Takoma Park, Maryland. *Kornegay* ECF No. 1 ¶¶ 1, 21, 24.

During his employment by PFPA, but before the shooting at issue in this case, PFPA conducted investigations of Dixon in connection with two prior uses of force at locations away from the Pentagon Reservation. The first occurred on May 6, 2020. Sierra Ford, a woman who did not have permanent housing at the time, had taken refuge in the Takoma Overlook Condominiums. *Id.* ¶ 37. At approximately 3:00 a.m.,

---

[1] At the pleadings stage, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

[2] The three complaints each lay out the factual allegations described in this section. For simplicity, where a particular fact is alleged in all three complaints, the Court will cite to the *Kornegay* complaint.

[3] For citations to ECF filings, page numbers refer to the number appearing in the CM/ECF header for this and other filings referenced herein, which may not align with the document's original page numbering.

Dixon came downstairs to walk his dogs. *Id.* ¶ 38. He saw Ford and ordered her to leave the building. *Id.* After Dixon walked his dogs and returned to his apartment, he told his wife to call 911. *Id.* ¶ 39. He then grabbed a bottle of pepper spray and a shotgun and headed back down to the lobby. *Id.* Dixon approached Ford, pointed the shotgun at her head and then pepper-sprayed her, causing Ford to leave the building. *Id.* ¶ 41. Dixon later reported this incident to PFPA, which opened a formal investigation. *Id.* ¶ 43. Plaintiffs allege that, despite inconsistencies in Dixon's story, which Plaintiffs allege were easily detectible if PFPA had reviewed the video footage of the incident (such as his claim that Ford attempted to stab his dog with a black metal shaft, which the video allegedly proves false), the PFPA Office of Professional Responsibility ("OPR") found that Dixon had not violated any PFPA rules, regulations, or policies. *Id.* ¶¶ 43–47, 51–54.

The second incident occurred on July 29, 2020. Around 7:00 p.m., Dixon was driving home from work when he allegedly cut off another driver. *Id.* ¶ 61. When the two cars stopped at a traffic light, the other driver exited his car, stood in the middle of the road while holding a hammer, and cursed at Dixon. *Id.* ¶ 62. In response, Dixon exited his car, unholstered his PFPA-issued handgun, and aimed it at the driver, who then got back in his car and drove off. *Id.* Plaintiffs allege that Dixon called 911 and told investigators that the driver had walked up to Dixon's car with a hatchet and was attempting to carjack him. *Id.* ¶¶ 63–64. Plaintiffs allege that, despite the D.C. Metropolitan Police Department detective's skepticism of Dixon's story, OPR concluded, after an investigation, that Dixon had not violated any PFPA rules, regulations, or policies. *Id.* ¶¶ 64–66.

Those two incidents occurred in May 2020 and July 2020, respectively (collectively, the "2020 incidents"). Plaintiffs summarize those two incidents as showing that, prior to the shooting in this case, Dixon "had proven himself to be a dangerous and dishonest employee of the PFPA, an employee that, according to PFPA's own mandatory self-imposed protocol unrelated to any policy choices, should have been terminated," and yet "the PFPA failed to take reasonable steps to protect others from the risk of harm that Dixon posed." *Id*. ¶ 69. The Court now turns to the April 7, 2021 shooting.

At approximately 5:00 a.m. that day, Dixon got into his car, in the parking lot of the Takoma Overlook Condominiums where he continued to live, to leave for work. *Id*. ¶ 21. Dixon was still employed as a law enforcement officer with PFPA. *Id*. ¶ 1. Dixon had his PFPA-issued handgun with him during his commute that day and was considered to be "on-call" according to the PFPA Regulations quoted above. *Id*. ¶ 25; *Kornegay* ECF No. 17-4 at 6 (§ IV.L). PFPA Regulations require "on-call" employees to "take immediate action to protect the health, safety, or welfare of a person from serious breaches of the peace (when violence is being committed or immediately threatened) including, but not limited to, assault and threats to kill, injure or maim." *Kornegay* ECF No. 17-4 at 10 (§ VI.E); *Kornegay* ECF No. 1 ¶ 22.

Plaintiffs allege that shortly after Dixon got into his car to drive to work, he passed a four-door black Lexus that was parked in the parking lot of the Takoma Overlook Condominiums that he did not recognize and considered suspicious. *Kornegay* ECF No. 1 ¶ 23. Plaintiffs allege that Dixon came to believe that the occupants were breaking into or stealing cars. *Id*. Dixon exited his vehicle, pointed a flashlight and his government-issued handgun at the Lexus, and moved towards it while screaming, "Stop, Police!" *Id*. ¶ 24. Upon hearing Dixon's orders, Johnson and Williams got into the

Lexus and Thomas began reversing out of the parking space. *Id.* ¶¶ 26–27. When shifting the car into drive, Thomas saw Dixon standing directly in front of the Lexus pointing a gun at the car. *Id.* ¶ 27. Thomas steered the car sharply to the right to avoid Dixon and began driving away. *Id.* After the Lexus had already passed Dixon, he opened fire on the back of the car, hitting Williams and Johnson. *Id.* ¶¶ 28–29, 32–33. Thomas had not been hit by any of the bullets, but realized that his friends had been, and began driving towards the hospital while calling 911 to report the shooting. *Id.* ¶ 29.

Dixon also called 911 to report the shooting. *Id.* ¶ 31. He also called the Pentagon Operations Center, as required of PFPA officers after any use-of-force incident. *Id.*; *Kornegay* ECF No. 17-3 at 9-10 (PFPA Regulation No. 9102 at §§ VI.E). Plaintiffs allege that Dixon did not report seeing any weapon in the Lexus to the police officers who arrived on the scene but, when later interviewed, claimed that he saw a handgun on the dashboard and thus perceived Williams, Johnson, and Thomas to be engaging in an armed robbery. *Id.* ¶¶ 25, 32. There was no gun recovered from the vehicle. *Id.* ¶ 25.

On April 30, 2021, a grand jury indicted Dixon on two counts of murder, one count of attempted murder, one count of first-degree assault, and three counts of handgun use in violent crime. *Id.* ¶ 34. Dixon pled guilty and is serving a 25-year prison sentence. *Id.* ¶ 35.

As discussed below, when a party seeks compensation from a federal agency, a written claim must be filed that sufficiently places the government on notice of potential lawsuits. *See* § III(A)(iii), *infra*. For reference, the following are the pertinent individuals and relationships; the lead plaintiff in each of the three cases is in bold:

- Dominique Williams (deceased) – minor children T.T., T.W., D.R.H., and H.W., **Layarnia Turner** (administrator of estate and mother of T.T. and

T.W.); Curtessa Huggins (mother of D.R.H.); Danelle Williams (mother of H.W.)

- James Johnson (deceased) – minor children Z.L., M.L., D.C.; **Marcus Kornegay** (administrator of estate); Janae Lancaster (mother of Z.L.); Aretha Adewetan (mother of M.L.); Lynette Cowell (mother of D.C.)

- Plaintiff **Michael Thomas**

In August 2022, on behalf of Williams's minor children, The Law Office of Lawrence B. Manley filed an SF-95 "Claim for Damage, Injury, or Death" form demanding $10 million for personal injury and $25 million for wrongful death along with "Affidavits And Authorization For Legal Representative" forms. *Turner* ECF No. 25-2.[4] On April 5, 2024, the complaint in Case No. 24-cv-1011 was filed by Plaintiffs Layarnia Turner, as administrator of the estate of Williams, as an individual, and as parent and next friend of T.T. and T.W.; Curtressa Huggins, as an individual and as parent and next friend of D.R.H.; and Danelle Williams, as an individual and as parent and next friend of H.W. (collectively, the "Turner Plaintiffs"). *Turner* ECF No. 1 ¶¶ 10–12.

On October 5, 2022, Plaintiff Marcus Kornegay, as administrator of Johnson's estate, filed an SF-95 "Claim for Damage, Injury, or Death" form demanding $2,225,000 for wrongful death of Johnson. *Kornegay* ECF No. 1 ¶ 9; *Kornegay* ECF No. 17-2. On April 5, 2024, the complaint in Case No. 24-cv-1010 was filed by Plaintiffs Marcus Kornegay, as administrator of Johnson's estate; Janae Lancaster, as parent and

---

[4] That claim form expressly refers to two of Williams's children ("DRH; TW and TW"). *Turner* ECF No. 25-2. The Court assumes, as the government appears to assume, that the second "TW" was a typo and refers to T.T. And the government does not dispute that that administrative claim encompassed Williams's fourth minor child, H.W., as well. *See Turner* ECF No. 25 at 6.

next friend of Z.L.; Aretha Adewetan, as parent and next friend of M.L.; and Lynette Cowell, as parent and next friend of D.C. (collectively, the "Kornegay Plaintiffs"). *Kornegay* ECF No. 1 ¶¶ 11–17.

On December 6, 2022, Plaintiff Thomas filed an SF-95 form, demanding $932,000. *Thomas* ECF No. 1 ¶ 9. On April 5, 2024, Thomas filed the complaint in Case No. 24-cv-1012. *Id.*

The complaints assert the following claims against the United States: battery (*Turner* Count 5, *Kornegay* Count 4, *Thomas* Count 4), negligence (*Turner* Count 6A,[5] *Kornegay* Count 5), gross negligence (*Turner* Count 6B, *Thomas* Count 5), negligent supervision/retention (*Turner* Count 7A, *Kornegay* Count 6, *Thomas* Count 6), negligent entrustment (*Turner* Count 7B, *Kornegay* Count 7, *Thomas* Count 7), and intentional infliction of emotional distress (*Thomas* Count 9).[6]

The complaints also assert claims against Dixon, for violating Plaintiffs' Fourth Amendment rights (Count 1 of all complaints), battery (Count 2 of all complaints), negligence (Count 3 of all complaints), gross negligence (*Turner* Count 4), and intentional infliction of emotional distress (*Thomas* Count 8). Dixon has not appeared in this case, either though counsel or *pro se*. The pending motions to dismiss were filed by the United States only. Accordingly, this opinion addresses only the claims asserted against the United States.

---

[5] The *Turner* complaint contains two causes of action numbered 6, and two numbered 7. The Court identifies them here as 6A, 6B, 7A, and 7B to avoid confusion.

[6] The complaints separately plead claims for "damages" (*Turner* ECF No. 1 at 26–28, *Kornegay* ECF No. 1 at 25–26, *Thomas* ECF No. 1 at 24) and "wrongful death" (*Turner* ECF No. 1 at 28–29, *Kornegay* ECF No. 1 at 26–27). The Court construes those claims as derivative of or a foundation for Plaintiffs' numbered causes of action, as opposed to separately pled causes of action.

The government filed motions to dismiss in the three cases. *Kornegay* ECF Nos. 17 & 27; *Turner* ECF Nos. 25 & 26; *Thomas* ECF Nos. 25 & 36. Plaintiffs filed a consolidated response to the motions to dismiss, cross-filed the consolidated brief in all three cases. *Kornegay* ECF No. 32; *Turner* ECF No. 36; *Thomas* ECF No. 41. The government filed a consolidated reply brief and cross-filed it in the three cases. *Kornegay* ECF No. 37; *Turner* ECF No. 39; *Thomas* ECF No. 46.

## II.    STANDARDS OF REVIEW

### A.    Subject-Matter Jurisdiction under Rule 12(b)(1)

Given that a motion to dismiss based on lack of subject-matter jurisdiction raises questions of the Court's authority to adjudicate a case, the Court must first determine whether it has jurisdiction over the claims before ruling on the merits. Fed. R. Civ. P. 12(b)(1); *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998)); *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "[I]f the governmental entity challenges jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of persuasion, and the court is free to consider exhibits outside the pleadings 'to resolve factual disputes concerning jurisdiction.'" *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir. 2002) (quoting *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)).

### B.    Failure to State a Claim under Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P.

12(b)(6). At the pleadings stage, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212.

To withstand a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative relief" by containing "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court reviewing a 12(b)(6) motion "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff," *King*, 825 F.3d at 212, bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal*, 556 U.S. at 679.

## III.    DISCUSSION

### A.    Subject-Matter Jurisdiction

"As a sovereign, the United States is immune from all suits against it absent an express waiver of its immunity." *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). The Federal Tort Claims Act ("FTCA") "effects a limited waiver of the United States' sovereign immunity." *Id.* (citing 28 U.S.C. § 1346(b)(1)). The government argues that this Court lacks subject-matter jurisdiction (1) over any of Plaintiffs' claims because Plaintiffs have not adequately alleged that Dixon was acting within the scope of his federal employment when he fired the shots at the car, (2) over Plaintiffs' negligence supervision/retention and negligent entrustment claims because PFPA's decision not to terminate Dixon's

10

employment following the 2020 incidents constituted a "discretionary function" rendering the waiver of sovereign immunity under the FTCA inapplicable, and (3) over the claims asserted in one or more capacities by certain Plaintiffs (Jane Lancaster, Aretha Adewetan, Lynette Cowell, Layarnia Turner, Curtressa Huggins, and Danelle Williams) because Plaintiffs failed to adequately present *those* claims to the agency as required to exhaust their FTCA claims.

### i.    Scope of employment

To maintain a claim under the FTCA, a plaintiff must allege and prove that the alleged negligent or wrongful act took place while the government employee was "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). This requirement is, at least in part, jurisdictional. *Kerns v. United States*, 585 F.3d 187, 194–95 (4th Cir. 2009). The determination of whether a person was acting within the scope of employment is made in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1). Thus, to establish that this Court has subject-matter jurisdiction under the FTCA, Plaintiffs need to have alleged facts that, if true, would establish that, under Maryland law, Dixon was acting within the scope of his employment with PFPA when he shot at the car.

Under Maryland law, "there is a two-pronged 'general test,'" known as "the *Sawyer* test," for "whether an employee acted within the scope of employment." *Balt. City Police Dep't v. Potts*, 468 Md. 265, 271 (2020). "The first prong of the *Sawyer* test is whether the employee's actions 'were in furtherance of the employer's business,' and the second prong is whether the employer 'authorized' the employee's actions." *Id.* (citing *Sawyer v. Humphries*, 322 Md. 247, 255 (1991)). "To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and

must occur during a period not unreasonably disconnected from the authorized period

of employment in a locality not unreasonably distant from the authorized area, and

actuated at least in part by a purpose to serve the master." *Sawyer*, 322 Md. at 255

(quoting *E. Coast Lines v. M. & C.C. of Balt.,* 190 Md. 256, 285 (1948)). "[A]n important

factor is whether the employee's conduct was 'expectable' or 'foreseeable.'" *Id.* at 256

(citations omitted). Foreseeability is measured "from the employer's perspective." *Potts*,

468 Md. at 289 (citing *Sawyer*, 322 Md. at 256). The Maryland courts also instruct that

other factors can be relevant too:

> (a) whether or not the act is one commonly done by such
> servants; (b) the time, place and purpose of the act; (c) the
> previous relations between the master and the servant; (d) the
> extent to which the business of the master is apportioned
> between different servants; (e) whether the act is outside the
> enterprise of the master or, if within the enterprise, has not
> been entrusted to any servant; (f) whether or not the master
> has reason to expect that such an act will be done; (g) the
> similarity in quality of the act done to the act authorized; (h)
> whether or not the instrumentality by which the harm is done
> has been furnished by the master to the servant; (i) the extent
> of departure from the normal method of accomplishing an
> authorized result, and (j) whether or not the act is seriously
> criminal.

*Sawyer*, 322 Md. at 256.

An employee's conduct falls outside the scope of employment where, for example,

the "employee's actions are personal, or where they represent a departure from the

purpose of furthering the employer's business, or where the employee is acting to

protect his own interests." *Id.* at 256–57 (citing *LePore v. Gulf Oil Corp.*, 237 Md. 591,

596–98 (1965); *Carroll v. Hillendale Golf Club*, 156 Md. 542, 545–546 (1929);

*Steinman v. Laundry Co.*, 109 Md. 62, 67 (1908); *Cent. Ry. Co. v. Peacock*, 69 Md. 257, 265 (1888)).

As for the requirement that an action was "authorized" by the employer, the question is not whether the "authority [was] expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to him by the [employer], even though in opposition to [the employer's] express and positive orders." *Id.* at 255 (quoting *Hopkins C. Co. v. Read Drug & C. Co.*, 124 Md. 210, 214 (1914)). Although "the illegality of an action cuts against a finding" that the action was within the scope of employment, *Chang-Williams v. United States*, 965 F. Supp. 2d 673, 689 (D. Md. 2013) (citing *Great Atl. & Pac. Tea Co. v. Noppenberger*, 171 Md. 378, 391 (1937)), illegality is not dispositive; "[a]n act may be within the scope of the employment, even though forbidden, done in a forbidden manner, or consciously criminal or tortious." *Potts*, 468 Md. at 285 (quoting *Cox v. Prince George's Cty.*, 296 Md. 162, 170–71 (1983)); *see also Cox*, 296 Md. at 170–71 (holding that although officers had committed an unjustified assault demonstrating excessive use of force, the scope of employment issue was for the jury). That is because "[t]here are many considerations relevant to whether an employee's actions were within the scope of employment." *Clark v. Prince George's Cnty.*, 211 Md. App. 548, 571 (2013).

A number of cases have considered whether a law enforcement officer who commits a crime can be considered to have been acting within the scope of the officer's employment. Generally, attempting to make an arrest is deemed to be within the scope of a police officer's employment even if, for example, the arrest was not supported by probable cause. *Sawyer*, 322 Md. at 260; *Potts*, 468 Md. at 307. Similarly, "excessive force does not necessarily render an officer's arrest of an individual outside the scope of

employment." *Potts*, 468 Md. at 308; *see also Torres v. Madrid*, 592 U.S. 306, 309 (2021) ("The application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person.").

Cases where Maryland courts have held that a police officer's use of force was outside the scope of employment have involved conduct that lacked even a colorable law enforcement purpose. In *Wolfe v. Anne Arundel County*, for example, the Maryland Supreme Court held that a police officer who made a traffic stop and then raped the female motorist was acting outside the scope of his employment. 374 Md. 20, 30 (2003). In *Brown v. Mayor*, the officer fired seventeen shots at a man with whom his wife was having an affair; the Appellate Court of Maryland held that, although the officer was in uniform and fired his department-issued gun, the officer's actions were completely personal. 167 Md. App. 306, 324–25 (2006). In *Clark*, the Appellate Court of Maryland held that, where a police officer shot two people in his home, either in an effort to protect his home and family or acting unprovoked, the officer was acting outside of his scope of employment. 211 Md. App. at 577. In *Sawyer*, the Maryland Supreme Court held that, when an off-duty police officer threw rocks at a person's car and attacked them, the officer was acting outside of the scope of his employment; but the court also held that, when that same officer followed the car until it stopped at a stop sign, walked up to the car, slapped the driver in the chest, and stated that he was a Maryland State Police Officer and that he was arresting them, he was then acting within the scope of his employment. 322 Md. at 260–61.

In other cases by Maryland courts (or federal courts applying Maryland law), law enforcement officers who committed crimes were held to have been acting within the scope of employment, or at least that a reasonable jury could so find. For example, in

14

*Potts*, the Maryland Supreme Court held that, when officers conducted a seizure without reasonable suspicion, attempted to fabricate evidence, and used excessive force, the officers were acting within the scope of their employment. 468 Md. at 306–08, 312–19. In *Chang-Williams*, Judge Chasanow held at summary judgment that there were sufficient factual disputes regarding whether the officers were authorized to take the alleged actions, whether the officers' actions were foreseeable by the government, and other disputed *Sawyer* factors such that a reasonable fact-finder could determine that the conduct was within the scope of employment. 965 F. Supp. 2d at 687–90.

Here, the Complaints sufficiently allege that Dixon was acting within the scope of his employment with PFPA when he attempted to seize Johnson, Williams, and Thomas. Plaintiffs allege that, based on PFPA Regulations, at the time of the alleged incident, Dixon was considered "on-call," which meant that he was authorized to take action if he considered such action necessary to protect the health, safety, or welfare of a person from a serious breach of peace. *Kornegay* ECF No. 1 ¶¶ 21–22; *Kornegay* ECF No. 17-4 at 6, 11 (§§ IV.H, IV.L, VII.1). Plaintiffs have alleged that Dixon himself believed he was acting on behalf of PFPA when he attempted to subdue Johnson, Williams, and Thomas, including given that he identified himself as a police officer during the encounter and used his government-issued handgun. *Kornegay* ECF No. 1 ¶¶ 24–25. And that all occurred against a backdrop in which Dixon had written to the Takoma Overlook Condominium Board—in response to a request by the Board that, if he witnessed a crime on the property, he should call 911 rather than intervene—that per PFPA regulations he could be held criminally liable or fired from his employment if he witnessed a crime and did *not* take action. *Id*. ¶¶ 48–49, 58. Whether Dixon was correct in his belief is not the question, at least at this stage. Just like in the May 6, 2020

incident, Dixon called PFPA immediately after the shooting, which Plaintiffs allege Dixon only believed was required in cases of use-of-force arising out of his employer relationship with PFPA. *Id.* ¶¶ 31, 43. Plaintiffs have also alleged that Dixon was not acting based on any personal gain or interest such as revenge on an enemy, attempting to protect his own personal property, or attempting to please a friend. *Cf. LePore*, 237 Md. at 596–98; *Carroll*, 156 Md. at 545–546; *Steinman,* 109 Md. at 67; *Cent. Ry. Co.*, 69 Md. at 265. Rather, Plaintiffs have alleged that Dixon was acting pursuant to his duties as a PFPA officer. ECF No. 1 ¶ 24, 49–50.

As for the additional *Sawyer* factors, several weigh against concluding that Dixon was acting within the scope of his employment, most importantly the last one ("whether or not the act [was] seriously criminal"). *See Sawyer*, 322 Md. at 256. Dixon's actions were criminal and have resulted in a 25-year sentence. The fact that his conduct was so clearly outside the bounds of appropriate use of force by law enforcement that he was charged and convicted of murder is a relevant factor that may militate against a finding that his conduct was within the scope of his employment—along with the fact that he was not at his place of employment, among other facts. But those facts do not *necessarily* render his actions outside the scope of his PFPA employment, as explained above. And several other of the additional *Sawyer* factors weigh in Plaintiffs' favor, at least at the pleadings stage, including "the time, place and purpose of the act" (while Dixon was on his way to work), "previous relations between the master and the servant" and "whether or not the master has reason to expect that such an act will be done" (in light of the prior on-call uses of force), "the similarity in quality of the act done to the act authorized" (the fact that Dixon, a PFPA law enforcement officer, was exercising the traditional law enforcement act of attempting a seizure), and "the instrumentality by

which the harm is done has been furnished by the master to the servant" (he used his PFPA-issued firearm).

At this stage, Plaintiffs' allegations must be accepted as true, along with all reasonable inferences therefrom. The Complaints have sufficiently alleged that Dixon's actions were incident to the performance of his federal law enforcement duties, particularly given PFPA's directions to its officers when they are on-call and believe themselves to be witnessing a crime. *Kornegay* ECF No. 1 ¶¶ 21–22, 87–88, 100, 104. Based on the PFPA regulations, and PFPA's handling of the instances when Dixon had previously pulled firearms on individuals including while on call (July 2020) and at his condominium complex (May 2020), the Complaints sufficiently allege for pleading purposes that Dixon's actions were in furtherance of his employment and foreseeable to PFPA within the meaning of the *Sawyer* test. Accordingly, the motion to dismiss the complaints on scope-of-employment grounds will be denied.

### ii.    Discretionary function exception

Plaintiffs have sued the United States for battery, negligence, gross negligence, negligent supervision/retention, negligent entrustment, and intentional infliction of emotional distress. The government argues that, even if the allegations are sufficient to allege that Dixon committed the shooting within the scope of his PFPA employment, sovereign immunity has not been waived specifically for the negligent supervision/retention claims (*Turner* Count 7A, *Kornegay* and *Thomas* Count 6) and the negligent entrustment claims (*Turner* Count 7B, *Kornegay* and *Thomas* Count 7) because the discretionary function exception to the FTCA applies to those claims.

Under the FTCA, the government cannot be held liable on claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or

duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This is called the "discretionary function exception." *United States v. Gaubert*, 499 U.S. 315, 323 (1991). "The wellspring of the discretionary function exception is the doctrine of separation of powers." *McMellon v. United States*, 387 F.3d 329, 342 (4th Cir. 2004) (en banc) (quoting *In re Joint E. & S. Districts Asbestos Litig.*, 891 F.2d 31, 35 (2d Cir. 1989)). The exception "articulates a policy of preventing tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of government" such as "when the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." *Id.* (citation omitted). The statute is the Federal *Tort* Claims Act, and "[t]ort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions." *Id.* (citation omitted).

But the exception is not limited to decisions made at "the policy or planning level." *Gaubert*, 499 U.S. at 325. It applies where (1) the "acts [] are discretionary in nature" in the sense that they "'involv[e] an element of judgment or choice,'" and (2) "the judgment was one that the exception was designed to protect, namely, a judgment based on considerations of public policy." *Id.* at 322–23 (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015) (citing *Gaubert*, 499 U.S. at 322). Plaintiffs bear the burden of proving that the exception does not apply. *Indem. Ins. Co. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009) (citing *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005)). "'[I]t is 'the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." *Gaubert*, 499 U.S. at 322 (quoting *United States v. Varig Airlines,*

467 U.S. 797, 813 (1984)). "There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Id.* at 325 n.7. "[W]hen properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537).

The question of whether the discretionary function exception applies is often fact-intensive. In *Rich*, for example, a prisoner was attacked by other inmates in a recreation area and sued the United States alleging, among other claims, that the prison managers were negligent for two reasons: (1) prison officials "should have kept him separated from his attackers," and (2) "the officials failed to screen, 'wand,' or search the inmates properly prior to placing them in the recreation cage." 811 F.3d at 142. The Fourth Circuit held that the exception applied to the first claim because "[p]rison officials are afforded discretion in determining where to place inmates and whether to keep certain individuals or gangs separated from one another," and such decisions "invoke several policy considerations for prison administrators" and thus "are precisely the kind of determinations that the discretionary function exception is intended to protect." *Id.* at 146. As to the second claim, however, the court held that at least at the pleadings stage the discretionary function exception did not entitle the government to dismissal. There were disputes, for example, over whether prison policies required patdowns, whether patdowns were performed, and whether those that did occur were performed properly, as well as whether Rich's attackers had a history of weapons possession that should have led prison officials to conduct a patdown (as opposed to

relying on a visual search). *Id.* at 146–47. There were also open questions about whether the prison officials' conduct was "marked by individual carelessness or laziness," which would fall outside the discretionary function exception. *Id.* at 147 (citing *Coulthurst v. United States,* 214 F.3d 106 (2d Cir. 2000)). Particularly given that "[t]here is always some level of discretion regarding the performance of even the most specific of mandates," and because the government in *Rich* "offer[ed] no limiting principle to its rationale as to when the exception should apply," the Fourth Circuit held that the plaintiff's second claim should proceed to discovery. *Id.* at 147 & n.7.

Here, the government argues that Plaintiffs' negligent supervision/retention and negligent entrustment claims are barred by the discretionary function exception because the pertinent conduct—allowing Dixon to carry a firearm and not firing him after the 2020 incidents—involved exercises of judgment (*Gaubert* prong 1), and that those decisions "are susceptible to policy analysis, which includes weighing and balancing social and economic considerations, such as budgetary concerns, staffing concerns, feasibility, efficiency, and priorities for finite resources" (*Gaubert* prong 2). *Kornegay* ECF No. 17 at 15–16.

The Fourth Circuit has addressed, in several cases, mostly unpublished, whether and when a negligent hiring, supervision, and retention claim is subject to the FTCA's discretionary function exception. In *Suter v. United States*, plaintiffs were victims of a Ponzi scheme, and alleged that because an undercover FBI agent infiltrated the conspiracy and, in some ways, "assisted" it, the FBI was liable for some of the plaintiffs' losses. 441 F.3d 306, 309 (4th Cir. 2006). The Fourth Circuit held the exception applied to the plaintiffs' claims because the agent's "participation in, and the FBI's approval of, criminal activity during the undercover investigation involved an element of judgment

or choice" (*Gaubert* prong 1) and "[t]he FBI's decision whether, as part of its investigation, to participate in criminal activity likely to result in financial loss to third parties 'is one which we would expect inherently to be grounded in considerations of policy'" (*Gaubert* prong 2). *Id.* at 311–12. Although some courts initially interpreted *Suter* as holding that negligent hiring, supervision, and retention claims were inherently barred by the discretionary function exception, *see, e.g.*, *LeRose v. United States*, 285 F. App'x 93, 97 (4th Cir. 2008), the Fourth Circuit has since clarified that the exception "does not categorically bar negligent hiring, supervision, and retention claims" but rather that "such claims should be analyzed pursuant to the clear test laid out by the Supreme Court in *Gaubert*." *Lins v. United States*, 847 F. App'x 159, 165 (4th Cir. 2021).

In the negligent hiring/supervision context, like in *Rich*, the application of the discretionary function exception can be highly fact- and claim-dependent. In *Lins*, the plaintiff, a veteran with PTSD, alleged that he was sexually abused by his Veterans Affairs therapist and that the VA was liable because the therapist had violated a "clear VA policy against engaging in dual relationships with patients, and her supervisors were aware of this violation but did not act according to the policy." *Id.* at 165–66. In that context, the Fourth Circuit held the discretionary function exception barred the plaintiff's negligent *hiring and retention* claims because "VA hiring and retention decisions are discretionary," and those decisions are sufficiently "grounded in public policy" to fall within the exception. *Id.* at 166. But the court held that the plaintiff's claim that the VA had negligently *supervised* the therapist "cannot be shielded by the discretionary function exception" because "the VA acted contrary to a mandatory policy that dictated how it should supervise its employees." *Id.*

Here, the Court assumes (without deciding) that Plaintiffs' negligent supervision/ retention and negligent entrustment claims involve challenges to PFPA's decisions that involved exercises of discretion, such as not taking action against Dixon following the 2020 incidents, sufficient to trigger *Gaubert* prong 1—*i.e.*, these challenged decisions "'involv[ed] an element of judgment or choice,'" *Gaubert*, 499 U.S. at 322. But like the patdown claim in *Rich* and the negligent supervision claim in *Lins*, here Plaintiffs have adequately alleged that the decisions by PFPA that they challenge through their negligent supervision/retention claims (*Turner* Count 7A, *Kornegay* and *Thomas* Count 6) and negligent entrustment claims (*Turner* Count 7B, *Kornegay* and *Thomas* Count 7) were not "decisions based on considerations of public policy," *Gaubert*, 499 U.S. at 323, for two reasons.

First, the Complaints sufficiently allege that PFPA's failure to fire Dixon after the 2020 incidents and/or to take away his firearm "at least suggests the possibility of careless inattention." *Rich*, 811 F.3d at 147. As explained above, Plaintiffs allege that if PFPA had conducted a reasonable investigation of those incidents, it would have easily discovered numerous inconsistencies between Dixon's version of the events and the evidence, including statements by D.C. Metropolitan Police Department detectives and video footage. In applying the second prong of the *Gaubert* test, the Fourth Circuit in *Rich* explained that "discretionary conduct cannot be grounded in a policy decision when that conduct is marked by individual carelessness or laziness." *Id*.

The situation alleged here differs from that in *Suter*, as Plaintiffs here do not allege that PFPA's guidelines for hiring or supervising its employees are themselves unreasonable or that PFPA is negligent in entrusting guns to its officers generally. Instead, Plaintiffs allege that PFPA had knowledge of Dixon's previous incidents, failed

to discover or acknowledge the inconsistencies that would have arisen in a thorough investigation, and failed to take any action to prevent further harm by Dixon specifically. *Kornegay* ECF No. 1 ¶¶ 43–47, 51–54, 59, 66–69. The situation here, at least as alleged, is analogous to the patdown claim in *Rich*, as Plaintiffs here allege that the failures to properly investigate or take proper administrative action were in direct violation of PFPA Regulations or at least suggest "careless inattention" in conducting the investigation. *See also Tyree v. United States*, 814 F. App'x 762, 768-69 (4th Cir. 2020) (holding that, because it was unclear whether the decision was made based on policy considerations or possible careless inattention, the plaintiff was entitled to discovery as to those facts).

Second, the specific failures to supervise and reprimand based on Dixon's prior incidents of misconduct that Plaintiffs allege here are not the type of determinations that are protected by the exception, at least at the pleadings stage. "Because the purpose of the exception is to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467 U.S. at 813; *Berkovitz*, 486 U.S. at 537) (internal citations omitted). Here, accepting Plaintiffs' allegations as true as the Court must do at the pleadings stage, and considering the two PFPA Regulations attached to the motions to dismiss and drawing all reasonable inferences in Plaintiffs' favor, it is unclear whether PFPA was properly exercising discretion grounded in policy considerations when it decided not to take action following Dixon's use of force in the two prior non-emergency situations.

For these reasons, the motion to dismiss based on the discretionary function exception will be denied. Facts might develop during discovery such that, at the summary judgment stage, the government may contend that the evidence does not permit Plaintiffs' negligent supervision/retention and negligent entrustment claims to proceed at that point. But with the facts alleged in the complaints accepted as true and all reasonable inferences drawn in Plaintiffs' favor, Plaintiffs have alleged facts sufficient to bring their negligent supervision/retention and negligent entrustment claims outside the scope of the discretionary function exception.

### iii.    Presentment

The government next argues that some of the Plaintiffs, in some of the capacities in which they have sued, did not "present[]" their claims as required by the FTCA. 28 U.S.C. § 2675(a). For the reasons that follow, the Court concludes that all of the claims that have been asserted in this Court were adequately presented with the exception of the claims asserted by Turner plaintiffs in their individual capacities.

### a.    Legal standards

Under the FTCA, "[a]n action shall not be instituted upon a claim against the United States for money damages for . . . personal injury or death . . . unless the claimant shall have first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a). Under the FTCA, "the requirement of filing an administrative claim is jurisdictional and may not be waived." *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1990) (quoting *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986)). If a tort claim against the United States is not presented to the appropriate federal agency within two years of the claim accruing, the claim is forever barred. 28 U.S.C. § 2401(b). "A claim is 'presented' if it gives the government adequate notice to properly investigate

the underlying incident and places a 'sum certain' on the claim's value." *Starr v. United States*, 262 F. Supp. 2d 605, 607 (D. Md. 2003) (citing *Mack v. United States*, Case No. 00-cv-2296, 2001 WL 179888, at *4 (D. Md. 2001), and *Ahmed*, 30 F.3d at 516–17). "The FTCA was not intended as a trap for the 'unwary claimant,' and 'the purpose of 28 U.S.C. § 2675(a) is to provide notice to the relevant federal agency of claims, not to put up a barrier of technicalities to defeat their claims.'" *Id.* at 607–08.

Here, the government does not dispute that sufficient claims were filed on behalf of Thomas, Marcus Kornegay (as administrator of Johnson's estate), and Williams's minor children (T.W., T.T., D.R.H., and H.W.) to satisfy the FTCA's presentment requirement. But it argues that the SF-95 forms that were filed did not encompass the claims that have now, in this Court, been asserted on behalf of Turner Plaintiffs Layarnia Turner (administrator of Williams's estate and mother of Williams's children T.T. and T.W.), Curtressa Huggins (mother of Williams's child D.R.H.), and Danelle Williams (mother of Williams's child H.W.), and Kornegay Plaintiffs Jane Lancaster (mother of Johnson's child Z.L.), Aretha Adewetan (mother of Johnson's child M.L.), and Lynette Cowell (mother of Johnson's child D.C.). *Turner* ECF No. 25 at 6–7; *Kornegay* ECF No. 17-1 at 6–7. As explained in greater detail below, Plaintiffs respond by arguing that the claims that were filed, even if they did not expressly enumerate certain claims, were sufficient to put the government on notice of those claims.

Generally, "if there are multiple claimants in the matter, each claimant must 'individually satisfy the jurisdictional prerequisite of filing a proper claim, unless another is legally entitled to assert such a claim on their behalf.'" *Muth v. United States*, 1 F.3d 246, 249 (4th Cir. 1993). But, in part because the purpose of the presentment requirement is to put the government on notice of a claim, courts generally "allow[]

claims to go forward," even "when all of the plaintiffs have not filed separate claims," where "the claims arose out of the same facts and were for the same amount of money." *Munger v. United States*, 116 F. Supp. 2d 672, 676 (D. Md. 2000) (citing *Nicholson Air Service, Inc. v. United States*, 686 F. Supp. 538 (D. Md. 1988)); *Starr*, 262 F. Supp. 2d at 607. Under the FTCA, exhaustion requires that the claim, but not necessarily the claimant or the theory of recovery, be presented to the agency. *Glover v. United States*, 996 F. Supp. 2d 372, 377 (D. Md. 2014); *Chang-Williams*, 965 F. Supp. 2d at 699; *Munger*, 116 F. Supp. 2d at 676.

For claims under the FTCA, such as for personal injury or death, legal determinations are made "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, whether a given claimant has a right to relief under state law may bear on whether adequate notice has been given to the federal agency. Under the Maryland Wrongful Death Act, wrongful death claims benefit "the wife, husband, parent, and child of the deceased person." Md. Code Ann. § 3-904(a)(1). In *Chang-Williams*, Judge Chasanow held that, in an incident where three people were shot but only one family submitted an administrative claim for wrongful death based on "the shootings and murders committed by [assailant]," the government was adequately notified that the mother of one of the other individuals shot was pursuing a wrongful death claim because she was the surviving parent and thus could sue under the Maryland Wrongful Death Act. *Chang-Williams*, 965 F. Supp. 2d at 699. In *Starr*, Judge Nickerson held that, where the mother of the decedent submitted an administrative claim in her capacity as the administrator of the decedent's estate, the claim put the government on sufficient notice that the decedent's mother and father were also seeking relief in their individual capacities, because they had a right to sue for

wrongful death under the Maryland Wrongful Death Act. *Starr*, 262 F. Supp. 2d at 607–08.

### b. Williams's and Johnson's children (through their mothers as parents and next friends)

Mr. Williams (*Turner*) left four surviving children: T.T., T.W., D.R.H., and H.W. The children's mothers have sued in part in their capacities as those children's parents and "next friends." As noted above, an administrative claim was filed that expressly asserted personal injury and wrongful death claims on behalf of Williams's children. *Turner* ECF No. 25-2 (SF-95 filed by The Law Office of Lawrence B. Manley on behalf of Williams's children). Similar to *Chang-Williams*, given that Williams's children would be the beneficiaries of a wrongful death action in Maryland for Williams's death and all his children are minors, the government was sufficiently on notice of the children's wrongful death claims, which could be filed either in their own capacities or through a next friend or guardian ad litem. Fed. R. Civ. P. 17(c)(2); *Turner* ECF No. 1 ¶¶ 10–12. Therefore, the administrative claim filed by Williams's minor children satisfied the administrative exhaustion requirement in order to file suit by and through their parents and next friends.

Similarly, Mr. Johnson (*Kornegay*) left three surviving children: Z.L., M.L., and D.C. Those children's mothers have sued in their capacities as those children's parents and "next friends." Mr. Kornegay filed an administrative claim that expressly asserted a wrongful death claim on behalf of Johnson's estate. *Kornegay* ECF No. 17-2 at 2 (SF-95 filed by "Marcus Kornegay, the Personal Representative of the Estate of James L. Johnson"). Therefore, similar to *Starr*, given that Johnson's children would be the beneficiaries of a wrongful death action in Maryland for Johnson's death and all his

children are minors, the estate's administrative claim put the government on notice of the children's wrongful death claims, which could be filed either in their own capacities or through a next friend or guardian ad litem. Fed. R. Civ. P. 17(c)(2); *Kornegay* ECF No. 1 ¶¶ 11–17.

### c. Layarnia Turner, as administrator of Williams's estate

Although the *Turner* administrative claim was submitted on behalf of Williams's minor children, those same children serve as the primary beneficiaries of his estate. Therefore, the Court concludes that the government was sufficiently on notice that a wrongful death claim could be filed on behalf of Williams's estate.

### d. Turner Plaintiffs in their individual capacities

The mothers of Williams's children, in addition to asserting claims on behalf of their children, have also sued in their "individual" capacities. The *Turner* SF-95 form does not expressly state that these individuals were asserting claims on their own behalf. So, the question becomes whether the SF-95 forms impliedly put the government on notice of such claims. As explained above, because Plaintiffs' claims are governed in part by Maryland law, *if* Turner Plaintiffs had a right to assert wrongful death claims in their individual capacities under the Maryland Wrongful Death Act, that might have militated in favor of construing the SF-95 forms to put the government on notice of such individual claims. But the Maryland Wrongful Death Act limits wrongful death actions to the "wife, husband, parent, [or] child of" Williams. Md. Code Ann. § 3-904(a)(1). Turner Plaintiffs have not alleged that they individually qualify under any of these categories. Therefore, the government was not sufficiently on notice of wrongful death claims by Turner Plaintiffs *in their individual capacities*. Accordingly, those claims will be dismissed.

28

**B.**     **Whether Plaintiffs sufficiently state a claim for negligent supervision/retention and negligent entrustment**

Next, the government contends that regardless of whether Plaintiffs have pled facts sufficient to establish that this Court has subject-matter jurisdiction, Plaintiffs' negligent supervision/retention and entrustment claims should be dismissed under Rule 12(b)(6). The government contends these claims fail because Plaintiffs have not adequately alleged that PFPA's retention of Dixon following the 2020 incidents, its allegedly inadequate supervision of him, or its decision to continue to entrust him with a firearm, proximately caused the shooting of Williams, Johnson, and Thomas. *Kornegay* ECF No. 17 at 18.

**i.**     **Negligent supervision/retention**

To plead a claim for negligent supervision and retention, "a plaintiff must plead facts that, if proven, would establish (1) her injury was caused by the tortious conduct of [an employee]; (2) that the employer knew or should have known by the exercise of diligence and reasonable care that the [employee] was capable of inflicting harm of some type; (3) that the employer failed to use proper care in selecting, supervising, or retaining that employee; (4) and that the employer's breach of its duty was the proximate cause of the Plaintiff's injuries." *Doe v. Cmty. Coll. of Balt. Cnty.*, 595 F. Supp. 3d 392, 419 (D. Md. 2022) (quoting *Jordan v. W. Distribut. Co.*, 135 F. App'x 582, 589 (4th Cir. 2005) (per curiam) (citations omitted)).

Plaintiffs allege that PFPA was negligent in its supervision of Dixon, and in its decision not to fire him after the 2020 incidents, because PFPA had actual or constructive notice that Dixon lacked the competence to serve as a law enforcement officer and posed a risk of harm to others, and that PFPA failed to act to reduce that risk.

*Kornegay* ECF No. 1 ¶ 109–114. The government argues these claims fail because Plaintiffs do not allege that PFPA's failure to terminate Dixon or adequately supervise him was the proximate cause of Dixon shooting Williams, Johnson, and Thomas, as Dixon's criminal actions were an intervening event. *Kornegay* ECF No. 17 at 18.

The Court concludes that the Complaints sufficiently allege facts in support of the negligent supervision and retention claims to proceed to discovery. The Complaints allege that PFPA was aware of at least two instances in which Dixon pointed a gun at someone, including once using his government-issued handgun, and that a proper investigation by PFPA would have shown that Dixon had provided a statement under oath in both incidents that directly contradicted evidence. *Kornegay* ECF No. 1 ¶¶ 44–47, 59, 65–66. Plaintiffs allege that a proper investigation would have shown that not only had Dixon lied to hide his true conduct in those instances, but also that Dixon was capable of inflicting harm and had a propensity to use firearms in improper or dangerous manners. *Id*. ¶¶ 45–47, 59, 64–66. Plaintiffs also allege that in both prior instances, Dixon pointed his gun at someone in circumstances that did not fit within the PFPA Regulations' definition of an emergency. *Kornegay* ECF No. 17-4 at 6 (§ IV.H). Therefore, Plaintiffs have sufficiently alleged that PFPA had a duty to act. Furthermore, Plaintiffs allege that PFPA's failure to reasonably act following the 2020 incidents was the proximate cause of Dixon's belief that he had a right (and perhaps even an obligation) to use his firearm any time he believed himself to be witnessing a crime while "on-call." *Kornegay* ECF No. 1 ¶¶ 52–54, 69. For these reasons, Plaintiffs allege sufficient facts to support a reasonable inference that PFPA's alleged failure to act was a proximate cause of Dixon's actions. Accordingly, the motion to dismiss Plaintiffs' negligent supervision/retention claims will be denied.

### ii.    Negligent entrustment

A negligent *entrustment* claim requires that (1) the defendant "ma[de] available to another a chattel," (2) the defendant knew or should have known that "the user [was] likely to use [the chattel] in a manner involving risk of physical harm to others," and (3) the defendant "should [have] expect[ed]" that such others would be "endangered by its use." *McGuiness v. Brink's Inc.*, 60 F. Supp. 2d 496, 500 (D. Md. 1999) (quoting *Mackey v. Dorsey*, 104 Md. App. 250, 258 (1995)). "If the supplier knows or should know of the entrustee's propensities to use the chattel in an improper or dangerous manner, the entrustor owes a duty to foreseeable parties to withhold the chattel from the entrustee." *Id.* (quoting *Herbert v. Whittle*, 69 Md. App. 273, 279 (1986)).

Plaintiffs allege that PFPA was negligent in continuing to entrust Dixon with a firearm after the 2020 incidents, and specifically to continue to permit him to take his PFPA firearm home with him. *Kornegay* ECF No. 1 ¶¶ 118–119. The government's arguments for why Plaintiffs fail to state a cognizable negligent entrustment claim are similar to those for the negligent supervision and retention claims: that PFPA cannot have foreseen that, by retaining Dixon and allowing him to continue to carry a firearm, he would use the firearm to shoot individuals he suspected of committing crimes. *Kornegay* ECF No. 17 at 18. But the Court must accept Plaintiffs' allegations and the reasonable inferences therefrom as true at this stage. And here, Plaintiffs allege that, despite PFPA's alleged awareness of the two other incidents in which Dixon used a gun (once with his department-issued handgun) in a non-emergency, the PFPA continued to make a .40 caliber Glock handgun available for use by Dixon while physically both on and off PFPA's locations. *Id.* ¶¶ 24–25, 40, 62, 118. For the same reasons Plaintiffs have adequately stated negligent supervision/retention claims, they have sufficiently alleged

facts that, if proven, would support a claim that the PFPA was negligent in its entrustment of a handgun to Dixon.

### C.    The government's alternative motions for summary judgment

As explained thus far, the government has principally argued that, even accepting Plaintiffs' allegations as true, the complaints should be dismissed on Rule 12(b)(1) and 12(b)(6) grounds. But the government also argues that the Court should apply the Rule 56 summary judgment standard. There are only limited circumstances, however, in which it is appropriate for a court to grant summary judgment prior to discovery. To be sure, Rule 56 permits a party to file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). And ordinarily, "to defeat a summary judgment motion because more discovery is necessary, a party must submit an affidavit or declaration regarding the need for discovery," *Brent v. City of Cumberland Police Dep't*, 700 F. Supp. 3d 314, 320 (D. Md. 2023) (citing Fed. R. Civ. P. 56(d)), which Plaintiffs have not done.

Nonetheless, in certain circumstances, it is proper to conclude that summary judgment would be "premature even when the opposing party [has] failed to file a [Rule 56] affidavit." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (citations omitted); *see also Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 787 (D.C. Cir. 1971) ("Summary judgment is only appropriate when there is no bona fide material issue, and Rule 56 clearly contemplates that the parties shall have opportunity for deposition in order to establish the existence of a material issue."). In general, when the non-moving party has had little to no opportunity to conduct discovery "through no fault of its own" and has adequately informed the court that the motion is premature based on lack of discovery on a material issue, courts

have not strictly adhered to the Rule 56(d) affidavit requirement. *Harrods*, 302 F.3d at 244; *see also id.* at 244–45 (explaining that a court may consider summary judgment premature when a party's objections "serve[ ] as the functional equivalent of an affidavit" and where the party was "not lax" in pursuing discovery) (quoting *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380–81 (D.C. Cir. 1988)). Here, although it appears that many facts are undisputed, there are many other highly relevant facts that are vigorously disputed. And under Local Rule 104.4, Plaintiffs were precluded from taking discovery until after the Court resolved the motions to dismiss and entered a scheduling order. Accordingly, the Court declines to convert the motion to one for summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the government's motions to dismiss (*Kornegay* ECF No. 17; *Turner* ECF No. 25; *Thomas* ECF No. 25) will be GRANTED IN PART and DENIED IN PART. The Court will grant the government's motion to dismiss as to Count 9 of *Thomas* (intentional infliction of emotional distress) as consented by Plaintiff (*Thomas* ECF No. 41 at 38). The Court will also grant the government's motion to dismiss as to *Turner* with regard to claims made by Turner Plaintiffs in their individual capacities only. The remainder of the government's motions to dismiss, and its alternative motion for summary judgment, will be denied. A separate order follows.


Date:  September 29, 2025                    _____/s/_____
                                            Adam B. Abelson
                                            United States District Judge